# UNITED STATES COURT OF APPEALS
# FIFTH CIRCUIT

_____

No. 01-60480

_____

NEW ORLEANS STEVEDORES;      SIGNAL     MUTUAL
ADMINISTRATION, LTD.,

                                    Petitioners-Cross-Respondents,

versus

PEGGY IBOS, Surviving spouse of Bertrand Ibos, Jr.;

                                    Respondent-Cross-Petitioner,

DIRECTOR,   OFFICE   OF   WORKERS'   COMPENSATION
PROGRAMS, US DEPARTMENT OF LABOR,

                                    Respondent.

Petition for Review of an Order of the
Benefits Review Board

January 16, 2003

Before KING, Chief Judge, and JONES and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

This case is on review of a judgment of the United States Department of Labor's Benefits

Review Board (the "BRB"), affirming a decision of an administrative law judge (the "ALJ"). The

ALJ held that New Orleans Stevedores ("NOS") is liable for compensation owed to Bertrand and

Peggy Ibos (respectively, "Decedent" and "Claimant") under the Longshore and Harbor Workers'

Compensation Act (the "LHWCA"),[1] but is entitled to a credit against its total liability for the net amounts Claimant received by way of settlements with two of Decedent's earlier longshore employers and their insurers.

Decedent worked for various steamship and stevedoring companies for a period spanning nearly fifty years. During the Decedent's last three periods of employment, he worked for Valor Stevedoring Company ("Valor"), Anchor Stevedoring Company ("Anchor"), and, most recently, NOS. When Decedent experienced respiratory problems which were subsequently diagnosed as symptoms of mesothelioma caused by occupational exposure to asbestos, he stopped working and filed a claim for disability benefits under the LHWCA. Decedent died due to metastatic mesothelioma and Claimant, his widow, continued his disability claim and her own claim for survivor's benefits, naming Valor, Anchor, and NOS as the potentially responsible employers. Following referral of the claim to the Office of Administrative Law Judges, Claimant entered into approved settlement agreements with Valor and Anchor pursuant to § 8 (I), 33 U.S.C. § 908 (I), of the LHWCA. Accordingly, Valor and Anchor, and their respective carriers, were dismissed from the present claim. Claimant did not enter into settlement agreements with NOS.

In the case against NOS, the ALJ held that, because Decedent's last period of injurious exposure to asbestos occurred during his employment with NOS, NOS is the responsible employer under the LHWCA. The ALJ then awarded Claimant temporary total disability benefits for Decedent's period of disability, to be followed by death benefits. Additionally, the ALJ held that NOS is entitled to a credit for the net settlement proceeds paid to Claimant by Valor and Anchor for

---

[1] Longshore and Harbor Workers' Compensation Act of Mar. 4, 1927, ch. 509, 44 Stat. 1424, *as amended*, 33 U.S.C. §§ 901-950.

the same occupational injury that is the subject of this claim.

On appeal to the BRB, NOS and its insurance carrier, Signal Mutual Administration, Ltd. ("Signal"), challenged the ALJ's determination that NOS is the responsible employer. In a cross-appeal, Claimant challenged the ALJ's award of a credit to NOS for the settlement monies paid by Valor and Anchor. The BRB affirmed both the ALJ's determination that NOS is the responsible employer and the ALJ's decision to award a credit to NOS.

NOS and Signal now appeal the BRB's judgment affirming the ALJ's determination that NOS is the responsible employer. Claimant and the Director of the Office of Workers' Compensation Programs, United States Department of Labor (the "Director"), urge affirmance of the BRB's responsible employer determination. On cross-appeal, Claimant challenges the BRB's judgment affirming the ALJ's decision to grant NOS a credit for the settlements Claimant received from Valor and Anchor. NOS and Signal respond that the credit was properly awarded.

We must review two aspects of the BRB's judgment: (1) whether the BRB misapplied the "last exposure rule," in light of the medical-opinion testimony of record regarding the "latency period" of mesothelioma; and (2) whether, in affirming the ALJ's decision to award NOS a credit, the BRB misapplied the general credit doctrine adopted in *Strachan Shipping Co. v. Nash*, 782 F.2d 513 (5th Cir. 1986) (en banc).

The BRB's final order is subject to review in the United States Court of Appeals for the circuit in which the injury occurred. 33 U.S.C. § 921 (c). We examine the BRB's decisions for errors of law to determine whether the BRB adhered to its scope of review. *Presley v. Tinsley Maint. Serv.*, 529 F.2d 433, 436 (5th Cir. 1976). Our review of the BRB's factual findings is limited to determining whether those findings are supported by substantial evidence on the record as a whole.

*Tampa Ship Repair & Dry Dock Co. v. Dir., OWCP*, 535 F.2d 936, 938 (5th Cir. 1976). With respect to issues of law, our review of the BRB's rulings is de novo. *Pool Co. v. Cooper*, 274 F.3d 173, 177 (5th Cir. 2001).

The BRB's views are not entitled to deference because it is not a policy-making agency. *Cooper*, 274 F.3d at 177. We do, however, give deference to the Director's interpretations of the LHWCA. *Id.* The exact amount of deference that we owe to any given interpretation by the Director "'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 219, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944))).

I

NOS and Signal argue that the BRB misapplied the *Cardillo* "last exposure rule" because it failed to conduct a proper rebuttal inquiry into the question of whether Decedent's exposure to asbestos while employed with NOS actually caused or contributed to Decedent's mesothelioma.[2]

---

[2] In occupational disease claims involving conditions caused by the cumulative effects of exposure over long periods of time, the "last exposure rule" identifies the liable party. The Department of Labor initiated this rule administratively, and it was first accepted for LHWCA claims by the Second Circuit in *Travelers Ins. Co. v. Cardillo*, 225 F.2d 137, 144 (2nd Cir.1955) (involving claims for hearing loss suffered by employees exposed to injurious stimuli in their last employment), *cert. denied*, 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955). Pursuant to the *Cardillo* "last exposure rule", the employer "during the last employment in which the claimant was exposed to injurious stimuli, prior to the date upon which the claimant became aware of the fact that he was suffering from an occupational disease arising naturally out of his employment, should be liable for the full amount of the award." *Id.* at 145. The rationale cited by the Second Circuit in adopting the rule was that, in light of the "present [poor] state of medical knowledge relating to these diseases," it is an administratively superior method that avoids the complexities of apportionment. *Id.* at 144.

The premise of NOS's and Signal's argument is that § 2 (2) of the LHWCA requires that, for an employer to be held liable, the employee's exposure to an injurious condition while working for that particular employer must either cause or contribute to that employee's compensable condition in some demonstrable way. From this premise, NOS and Signal contend that the BRB erred when, in its rebuttal inquiry, it rejected the medical-opinion testimony of record concerning the "latency period" of mesothelioma which, according to NOS and Signal, suggests that there could not have been a true causal link between Decedent's exposure to asbestos while employed with NOS and the development of Decedent's mesothelioma. Specifically, NOS and Signal argue that they have met their burden of showing that a true causal link does not exist in this case, because the medical evidence of record demonstrated that the latency period for the development of mesothelioma is long enough to suggest that Decedent's development of mesothelioma began years before Decedent's last period of employment with NOS, and that any additional exposure to asbestos during that period had no impact on the course of his disease.

First, we disagree with NOS's and Signal's premise that, for purposes of liability, § 2 (2) of the LHWCA requires a true causal link between Decedent's exposure while working for NOS and the development of Decedent's mesothelioma. Under § 2 (2), there are two prongs to the statutory definition of a compensable "injury": "[1] accidental injury arising out of and in the course of employment, *and* [2] such occupational disease or infection [a] *as arises naturally out of such employment* or [b] as naturally or unavoidably results from such accidental injury[.]" LHWCA § 2 (2), 33 U.S.C. § 902 (2) (emphasis added). The Director interprets the "arises naturally out of" language of § 2 (2) to require only that the conditions of the employment be *of a kind* that produces

-5-

the occupational disease. This interpretation is consistent with congressional intent, as it was first interpreted by the Second Circuit in *Travelers Ins. Co.* v. *Cardillo*, 225 F.2d 137 (2d Cir. 1955). In *Cardillo*, the Second Circuit found, as a matter of legislative interpretation, that Congress intended full liability to rest on the last exposing employer, regardless of the absence of actual causal contribution by the final exposure. *Cardillo*, 225 F.2d at 145.

We agree with *Cardillo*'s legislative interpretation. In the congressional hearings preceding the LHWCA's passage, an employer representative suggested that the LHWCA should include a provision limiting an employee's total recovery against a particular employer to the same ratio as the extent of the harm done during the period worked for that employer bore to the total disability. *To Provide Compensation for Employees Injured and Dependents of Employees Killed in Certain Maritime Employments: Hearing before the House Judiciary Committee on H.R. 9498*, 69th Cong., 1st Sess. 72 (1926).[3] After discussion, those involved in the hearing accepted the employer representative's complaint that, without such a provision capping liability, a "last employer" would be liable for the full amount of compensation, even if the duration of the injured employer's employment was so brief that the injury would probably not be medically attributable at all to that "last employment." *Id*. at 74-75; *Cardillo*, 225 F.2d at 145. The suggested provision was not, however, incorporated into the LHWCA. We infer that Congress declined to adopt the suggested provision because it realized the administrative difficulties certain to arise if such a provision were incorporated into this section of the LHWCA. *Cardillo*, 225 F.2d at 145. As *Cardillo* recognized, "[t]he nature of occupational diseases . . . make[s] it exceedingly difficult, if not practically

_____

[3] The suggested provision stated: "But only such proportion shall be compensated by the employer in whose employment disability begins as the period employed by such employer bears to the total period of the accumulation of the disease."

impossible, to correlate the progression of the disease with specific points in time or specific industrial experiences." *Id*. at 144. We therefore defer to the Director's interpretation that § 2 (2)'s "arises naturally out of" language requires only that the conditions of the employment be *of a kind* that produces the occupational disease, because "Congress intended that the employer during the last employment in which the claimant was exposed to injurious stimuli . . . should be liable for the full amount of the award." *Id* at 145.

Second, we agree with NOS and Signal that the BRB failed to articulate the appropriate legal standard to be applied by an ALJ in its rebuttal inquiry of an occupational disease claim brought under the LHWCA. The BRB reasoned that, in an occupational disease claim brought under the LHWCA, an employer can rebut an employee's prima facie case if that employer establishes that the claimant's exposure with that employer did not have the potential to cause the disease. Applying this standard, the BRB held that NOS did not satisfy its burden of proving that it is not the responsible employer on the basis of medical opinions concerning the "latency period" for the development of mesothelioma because "these opinions do not establish that the asbestos exposure experienced by decedent at NOS did not have the potential to give rise to mesothelioma." Contrary to the BRB's reasoning, the issue on rebuttal is not whether an employer can prove that a particular exposure with a particular employer did not have the potential to cause the disease. Neither is the issue on rebuttal whether an employer can prove that there is no evidence of a true causal link between a particular exposure and the development of the employee's disease. Rather, we have held that, after it is determined that an employee has made a prima facie case of entitlement to benefits under the LHWCA, the burden shifts to the employer to prove either (1) that exposure to injurious stimuli did not cause the employee's occupational disease, or (2) that the employee was performing work

-7-

covered under the LHWCA for a subsequent employer when he was exposed to injurious stimuli.

*Avondale Indus., Inc. v. Dir., OWCP* [*Cuevas*], 977 F.2d 186, 190 (5th Cir. 1992).[4]  Thus, in the

present claim, the only issue the ALJ was to consider in its rebuttal inquiry was whether NOS proved

that exposure to asbestos did not cause Decedent's mesothelioma, regardless of whether the exposure

Decedent experienced at NOS either caused or had the potential to cause Decedent's mesothelioma.[5]

Although the BRB failed to articulate the applicable legal standard, we find there is substantial

evidence in the record as a whole to support the ALJ's finding that Decedent died of mesothelioma

resulting from his overall occupational exposure to asbestos.[6]  NOS had an opportunity to present

---

[4] In *Cuevas*, we held: "[A] claimant does not have to prove that his employer is liable.  Once he has demonstrated a prima facie entitlement to benefits by showing that he 'sustained physical harm and that conditions existed at work which could have caused the harm,' he has established that his 'exposure to injurious stimuli during employment covered under the [LHWCA], and there exists a compensable claim.  Employer can then rebut this presumption by showing that exposure to injurious stimuli did not cause the harm . . . [or] that employee was exposed  to injurious stimuli while performing work covered under the [LHWCA] for a subsequent employer.'" *Cuevas*, 977 F.2d at 190 (quoting *Susoeff v. San Francisco Stevedoring Co.*, 19 BRBS 149, 1986 WL 66392 at *2 (Ben. Rev. Bd. Nov. 28, 1986)).

[5] We note that two other major maritime circuits have rejected similar latency arguments in deciding asbestos-related claims under the LHWCA.  *See Norfolk Shipbuilding & Drydock Corp. v. Faulk*, 228 F.3d 378, 386-87 (4th Cir. 2000) (rejecting the last employer's latency argument and holding the last employer liable for the full amount of the claim); *Lustig v. U.S. Dep't of Labor*, 881 F.2d 593, 596 (9th Cir. 1989) (reasoning that the latency argument "suggests an unwarranted change of the 'last employer rule' set forth in [*Cardillo*] . . . which change we decline to adopt" (internal citation omitted)).

[6] The ALJ concluded that the "[m]edical evidence presented by Drs. Caputto, Martin, Abraham, M.D. Anderson, and Touro demonstrated that Claimant suffered from malignant mesothelioma related to occupational asbestos exposure."  The only testimony NOS presented to rebut the evidence that Claimant suffered from mesothelioma was that of Dr. Sandler, who testified that Claimant did not clearly suffer from mesothelioma.  However, the ALJ was not impressed by Dr. Sandler's opinion because Dr. Sandler is not a pathologist and because Dr. Sandler "did not take into consideration the overwhelming evidence of the pathologists who provided credible testimony and

specific, comprehensive medical evidence disproving that Decedent's mesothelioma was caused by his exposure to any asbestos, but failed to do so.[7] Thus, we hold that the BRB properly affirmed the ALJ's judgment that NOS did not meet its burden of disproving Claimant's prima facie case.

## II

Claimant argues that the ALJ's judgment that NOS is entitled to credit against its liability for the net amounts received by Claimant from the settling employers (Valor and Anchor) was an inappropriate application of the extra-statutory credit doctrine adopted in *Strachan Shipping Co. v. Nash*, 782 F.2d 513 (5th Cir. 1986) (en banc). It is also the Director's position that the amounts Claimant received from LHWCA settlements with Valor and Anchor are irrelevant to the amount owed by NOS and should not reduce its liability. We agree that the BRB erred in affirming the ALJ's application of the *Nash* credit doctrine in this context.

The *Nash* credit doctrine allows credit for the amount of a prior scheduled award, against a later scheduled award, based on a later injury to the same scheduled member, such as a leg. *See*

---

medical evidence in this case."

[7] This addresses the due process concerns raised by NOS and Signal, as well as its argument that the BRB inappropriately applied the last exposure rule as an "irrebuttable presumption." First, the ALJ's application of the last exposure rule did not prohibit genuine factual inquiry on the critical issues in this case. At the hearing before the ALJ, all parties were given the opportunity to adduce testimony, offer documentary evidence, and submit post-hearing briefs in support of their positions. Second, even though NOS and Signal argue that the last exposure rule is based on assumptions about the advances of medical science which may no longer be true, NOS's medical-opinion evidence concerning the latency period between the inhalation of asbestos fibers and the manifestation of mesothelioma only validates the Director's argument that the last exposure rule is still necessary for administering the statute. As the Director points out, the estimates of the latency period, ranging from ten to forty years, suggest that the "responsible" employer in the Decedent's case may possibly have been any one of the forty-one longshore employers he worked for over the course of his entire career.

*Nash*, 782 F.2d at 518-21. In *Nash*, the claimant sought compensation for successive, aggravating injuries to his leg, a scheduled member under 33 U.S.C. § 908 (c). *Nash* recognized that the BRB, in a series of its decisions, had developed an equitable credit doctrine to prevent the double compensation that might result from the peculiarities of the "aggravation rule," which requires an employer to pay full compensation for an employee disability, even if the work-related injury simply aggravated a preexisting disability sustained while working for a previous employer. *Id.* at 517-22. Under the BRB's credit doctrine, "where the worker has been actually compensated for disability to the same member at a previous point in time," the liability for the aggravation of that impairment should be reduced by the amount the worker has received for a part of the overall scheduled impairment. *Id.* at 518. Applying this credit doctrine, *Nash* affirmed the BRB's judgment that the claimant's latest employer and its insurer (the defendants) should compensate the claimant for his entire thirty-four percent permanent partial disability to his leg resulting from three knee injuries, but that the ten percent compensation the claimant had actually received from a previous employer at an earlier date should be subtracted from the total award. *Id*. at 522.

Unlike *Nash*, Claimant has not sought compensation for successive, aggravating injuries. Rather, the settlements Claimant accepted were alternative to an entire award against either one of the settling employers, Valor and Anchor, who could have been held liable for such an award if found to be Claimant's last responsible employer. Thus, the *Nash* credit doctrine does not apply in this context, alternative liability for a single occupational injury, because the "aggravation rule" also does not apply.[8]

_____

[8] For the proposition that NOS is entitled to a credit for payments of compensation made by other potentially liable employers in settlement of Claimant's occupational disease claim, the BRB

Moreover, even though *Nash* applied an extra-statutory credit doctrine to the successive-scheduled-injuries context, we refuse to venture further outside the credit system provided in § 903 (e) in order to create a new extra-statutory credit doctrine in the context of this case. Had Congress intended for a liable employer to receive a credit against its total liability for sums the injured employee received by way of settlements under the LHWCA with previous employers, Congress would have explicitly provided for such a credit. Section 3 (e) permits credit for any past recovery, even against a different employer, "for the same injury, disability, or death" under "any *other* workers' compensation law" or under the Jones Act. 33 U.S.C. § 903(e) (emphasis added). Section 3 (e) makes no mention of a credit being available for a prior recovery under the LHWCA itself. Its legislative history indicates the reason. In 1984, Congress enacted the new § 3 (e) to alter the result of the then-recent decision of *United Brands Co. v. Melson*, 594 F.2d 1068 (5th Cir. 1979), thereby enabling liable employers to receive credit for recoveries an employee received from former employers pursuant to a state workers' com pensation law. *See* 130 Cong. Rec. 25905 (Sept. 18, 1984) (statement of Sen. Erlenborn) ("The offset would, therefore, apply . . . where the employee's nonlongshore claim is against an employer other than the one against whom he has filed a longshore claim. Accordingly, the court's decision on this point in *Melson* . . . is overruled.").[9] Congress did

_____

cited *Alexander v. Triple A. Machine Shop*, 32 BRBS 40, 44-46 (1998), *aff'd after remand*, 34 BRBS 34 (2000), wherein the BRB held that the *Nash* general credit doctrine applies in this context. The Ninth Circuit recently reversed the BRB's decision , holding that "denial of the credit is compelled by the purposes of the credit doctrine and 33 U.S.C. § 903 (e)." *Alexander v. Dir., OWCP; Triple A Machine Shop, Inc.*, 297 F.3d 805, 809 (9th Cir. 2002). The court reasoned that "the aggravation rule was not in play, and hence the credit doct rine was not applicable." *Id*. It further reasoned that "[a]pplying § 903 (e) against alternative settlement awards overzealously extends the provision beyond its intended purpose." *Id*.

[9] In *Melson*, we held that, because there was no provision in the LHWCA allowing a liable employer credit for recoveries paid to the employee by a different employer pursuant to state law, no

-11-

not address the question of whether a liable employer can or should receive credit for LHWCA settlements paid to the employee by former employers. Congress' silence on this particular question, we conclude, indicates that it did not intend for employers to receive such credits.[10] We therefore defer to the Director's interpretation that the amounts Claimant received from LHWCA settlements with other employers, before the determination that the disability and death were compensable and that NOS is the liable employer, are irrelevant to the amount owed by NOS and should not reduce its liability.

For these reasons, we hold that the BRB erred in affirming the ALJ's judgment granting credit to NOS for Claimant's net settlement receipts from Valor and Anchor.

III

In conclusion, we AFFIRM the BRB's judgment affirming the ALJ's determination that NOS is the responsible employer. We REVERSE the BRB's judgment affirming the ALJ's decision that NOS is entitled to credit for Claimant's net settlement receipts from Valor and Anchor, and REMAND for proceedings that are not inconsistent with this opinion.

---

such credit was available. *Melson*, 594 F.2d at 1074-75.

[10] *See ITO Corp. v. Dir., OWCP* [*Aples*], 883 F.2d 422, 425 (5th Cir. 1989) (reasoning that § 3 (e) has no application to prior recoveries under the LHWCA; it only applies when the prior compensation was paid under a state workers' compensation provision or the Jones Act). *Cf., e.g.*, *Ceres Gulf v. Cooper*, 957 F.2d 1199, 1205-07 (5th Cir. 1992) (reasoning that the several provisions of the LHWCA providing for the recoupment of overpayments out of an unpaid compensation otherwise payable, without provision for other forms of recoupments, demonstrates that there is no remedy available against the claimant for recoupment of overpayments where no further compensation is due).

EDITH H. JONES, Circuit Judge, dissenting:

With due respect to my colleagues, I dissent from the decision to overturn the BRB's award of dollar-for-dollar credit to New Orleans Stevedores for the amounts paid in settlement to Ibos's widow by his previous employers Valor and Anchor. In consequence of the majority decision, Mrs. Ibos recovers considerably more benefits than she would with a single application of LHWCA compensation. The majority's rationale is that the credit doctrine is "extra-statutory," and although this court approved the doctrine in a previous en banc decision,[11] the majority will not "extend" the doctrine to this allegedly distinct situation.

The majority, in my view, too lightly disregards Nash, which approved the BRB's now 30-year old credit doctrine expressly because that rule assures fairness both to employees and employers -- guaranteeing full reimbursement to the former while protecting the latter against double payments of benefits. Although Nash arose from an aggravating injury, there is no persuasive reason to distinguish last employer rule cases and aggravation rule cases. The difference between the names is more a matter of identification than substance. Under both rules, the last employer to expose the claimant to the cause of the injury or disease is responsible for the entire compensation award.[12] As this court has acknowledged, the last employer rule "can operate inequitably where a claimant worked

[11]Strachan Shipping Co. v. Nash, 782 F.2d 513, 518-22 (5th Cir. 1986) (en banc).

[12]In fact, under the last employer rule, the last employer need not be an actual cause, but simply a potential cause of the occupational disease. Avondale Indus., Inc., 977 F.2d at 190.

-13-

only a minimal time for the last covered employer." Avondale Indus., Inc. v. Director, OWCP, 977 F.2d 186, 190 (5th Cir. 1992). In aggravation rule cases "[t]he credit doctrine was developed to prevent double recoveries where the worker has been previously compensated for the same disability." ITO Corp. v. Director, OWCP [Aples], 883 F.2d 422, 427 (5th Cir. 1989) (emphasis added). This is consistent with one of the primary objectives of LHWCA: "to protect employers who are subjected to absolute liability by the Act." Louviere v. Shell Oil Co., 509 F.2d 278, 283 (5th Cir. 1975) (quoting Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 412, 74 S. Ct. 202, 206 (1953)). The majority, however, is willing to allow a double recovery in this case because it nominally falls within the last employer rule rather than the aggravation rule.[13]

In fact, one might reasonably read Cardillo itself, which originated the extra-statutory last employer rule, to be an aggravation rule case. See Cardillo, 225 F.2d at 140-42 (claimants suffered permanent hearing loss due to exposure while working for various employers); Avondale Indus., Inc., 977 F.2d at 189 n.1 (stating that "the aggravation rule allows a complainant compensation where work-related acoustic trauma aggravates or combines with a prior hearing impairment"). If Cardillo is fairly read to represent an aggravation of an occupational injury or disease, then this court is bound by Nash to apply the credit rule.

The majority reasons that the credit rule must be limited because it is "extra-statutory." That reasoning simply flies in the face of the Nash decision, which upheld the credit rule notwithstanding its extrastatutory character. Moreover, the credit doctrine operates here to

---

[13]In fact, the aggravation rule finds its origins in the last employer rule. Foundation Constructors, Inc. v. Director, OWCP [Vanover], 950 F.2d 621, 623 (9th Cir. 1991); see also Bath Iron Works Corp. v. Dir., OWCP, 244 F.3d 222, 228 (1st Cir. 2001) (stating that the aggravation rule "is really nothing more than a variation of the last employer rule").

ameliorate the dramatic consequences of another <u>judicially</u> <u>created</u> rule. The majority purports to defend the last employer rule as if it had been approved by Congress, but this court has characterized it as "a <u>judicially created rule</u> for allocating liability among employers in cases where an occupational disease develops after prolonged exposure." <u>Avondale Indus., Inc.</u>, 977 F.2d at 190 (emphasis added) (quotation omitted).

If these issues were questions of first impression, we might look at no more than the statutory language of the LHWCA and might conclude that there is no justification for the last employer rule or the credit doctrine. Given the wealth of precedent, however, we are not free to roam. We are justifiably bound by a fifty-year old last employer rule, a thirty-year old credit doctrine, a fifteen-year old en banc decision of this court (<u>Nash</u>) and ten-year old interpretations of the foregoing (<u>Avondale Indus.</u> and <u>Aples</u>). Only by picking and choosing among the authorities does the majority reach the patently inequitable result in this case.

I respectfully **DISSENT**.